UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X

DENA BARON,

                Plaintiff,

                                  **MEMORANDUM AND ORDER**

        -against-                    16-CV-6481

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

---------------------------------------X

**MATSUMOTO, United States District Court Judge**

        Plaintiff Dena Baron ("plaintiff") seeks judicial review of the final decision of defendant Commissioner of Social Security ("defendant" or the "Commissioner"), denying plaintiff's application for Supplemental Security Disability Income benefits ("SSDI") under Title XVI.[1]  Presently before the court are plaintiff's and defendant's motions for judgment on the pleadings.  For the reasons set forth below, plaintiff's motion for judgment on the pleadings is denied in part and granted in part and defendant's cross-motion for judgment on the

---
[1] Individuals may seek judicial review in the United States district court for the judicial district in which they reside of any final decision of the Commissioner of Social Security rendered after a hearing to which they were a party, within sixty days after notice of such decision or within such further time as the Commissioner may allow.  *See* 42 U.S.C. § 405(g).

pleadings is denied.  The case is remanded for further
proceedings consistent with this opinion.

**BACKGROUND**

## I.  <u>Procedural History</u>

Plaintiff applied for SSDI on December 24, 2013,
alleging a disability onset date of January 23, 2013, due to
pain, neurological problems, edema, and hearing problems.  (ECF
No. 16, Administrative Transcript ("Tr.") at 56.[2])  Plaintiff's
memorandum claims that her disorders include swelling of both
legs, pain in her back and neck, and a neurogenic bladder that
causes frequent urination.  (ECF No. 13, Pl. Mem. at 2.)  On
June 4, 2014, the Social Security Administration (the "SSA")
denied plaintiff's claim.  (Tr. 64-67.)  Plaintiff requested a
hearing before an Administrative Law Judge (Tr. 68), and the
hearing was held on August 10, 2015, before Administrative Law
Judge Michael Friedman (the "ALJ" or "ALJ Friedman").  (Tr. 26-
54.)  Attorney Charles Weiser represented plaintiff at the
hearing.  In a decision dated September 22, 2015, the ALJ found
plaintiff not disabled.  This became the final decision of the
Commissioner on October 31, 2016, when the Appeals Council
denied plaintiff's request for review.  (Tr. 1-3.)  Plaintiff

---

[2] Citations to the Administrative Transcript refer to the internal pagination
and not the page number assigned by the Electronic Case Filing ("ECF")
system.

commenced the instant action on November 22, 2016. (ECF No. 1, Complaint ("Compl.").)

## II.   <u>Plaintiff's Education and Work History</u>

Plaintiff was born on July 10, 1971 and is a United States citizen. (Tr. 94.) She was 42 years old at the time of the alleged onset date. She has a college degree and pursued a Master's degree. (Tr. 49, 113.) Prior to the alleged onset date, plaintiff worked as a paralegal from 1998 to 2005 and as a teacher from 2006 to 2013. (Tr. 43, 62, 113, 131.) Plaintiff has one child, who was born in 2012. (Tr. 38.)

## III.  <u>Medical History Prior to Alleged Onset Date</u>

On May 8, 2007, Dr. R.C. Krishna, a neurologist, performed an electrodiagnostic study, which revealed "no evidence of carpal tunnel syndrome." (Tr. 284.) On August 17, 2007, Dr. Krishna reported that plaintiff was under his care for diagnoses of chronic fatigue syndrome, tension headaches, and bronchial asthma. (Tr. 341.) He noted that plaintiff was using a nebulizer for her asthma three to four times per day. (*Id.*)

An ultrasound of plaintiff's carotid arteries performed on March 16, 2010 demonstrated "1-15% stenosis in" and "multiple small echogenic plaques" on the left common carotid artery. (Tr. 325.) Blood flow was normal in the vertebral arteries bilaterally. (*Id.*) A transcranial doppler report from the same day yielded normal results. (Tr. 326.)

On May 24, 2011, Dr. Harold S. Parnes, a board certified radiologist, performed an MRI of plaintiff's brain. (Tr. 239-40.) The MRI revealed "[n]o evidence of intracranial mass effect, shift of the midline structures, or hydrocephalus." (Tr. 239.) Dr. Parnes noted "[n]o significant change . . . in comparison to the prior study" dated March 23, 2010. (Tr. 240; *see also* Tr. 241-42 (March 23, 2010 MRI results).) Dr. Krishna conducted an ultrasound of plaintiff's carotid arteries on May 17, 2011, and he found "1-15% stenosis in the left common carotid artery" and "the right subclavian artery," and plaque on those arteries. (Tr. 310.) Dr. Krishna also identified minimal spectral broadening in plaintiff's right internal carotid artery. (*Id.*) However, blood flow was normal in plaintiff's vertebral arteries bilaterally. (*Id.*) Later that month, plaintiff weighed 190 pounds. (Tr. 314.) On August 19, 2011, plaintiff tested positive for THC and opiates. (Tr. 309.)

Plaintiff's blood tested positive for THC and Xanax on March 22, 2012 and benzodiazepine, opiate, and cocaine on December 13, 2012. (Tr. 296, 299.)

On August 2, 2012, Dr. Vaynshelbaum performed an ultrasound of plaintiff's carotid arteries and their branches, and found they demonstrated normal velocity of blood flow. (Tr. 301.) The doctor concluded there was no evidence of occlusion, obstruction, or other abnormalities. (*Id.*) On the same day,

Dr. Krishna measured plaintiff as five feet and four inches tall and weighing 185 pounds.  (Tr. 306.)  On August 7, 2012, plaintiff tested positive for Benzodiazepine and THC.  (Tr. 303.)

On October 22, 2012, plaintiff saw Dr. Parnes for an MRI of the lumbosacral spine.  (Tr. 243-44.)  Dr. Parnes noted "straightening and reversal of the normal curvature on the sagittal views," multi disc space narrowing and desiccation, multilevel facet hypertrophic arthropathy, and posterior disc herniations at the L4-L5 and L5-S1.  (Tr. 243-44.)  He also recommended a pelvic sonogram for further evaluation of plaintiff's uterus.  (Tr. 244.)  On October 23, 2012, Dr. Parnes performed an MRI of plaintiff's cervical spine.  (Tr. 245-46.)  In addition to the findings from the lumbosacral MRI, Dr. Parnes noted that the cervical spine MRI revealed: disc space narrowing at C4-C5 and impingement of the anterior thecal sac at those levels; a mucosal retention cyst in the left maxillary sinus; and posterior disc herniation at C6-C7 with impingement of the anterior thecal sac, cervical cord, and bilateral neural formina.  (Tr. 246.)  Dr. Parnes recommended a thyroid sonogram to enable further evaluation of a slightly enlarged thyroid gland.  (*Id.*)

In a letter to Dr. Krishna dated October 23, 2012, Dr. Mehrdad Hedayatnia, a board certified pain management

specialist, reported that plaintiff had recently given birth and was complaining of "severe lower back with radiation to lower extremity, intractable pain not responding to conservative treatment," including physical therapy, anti-inflammatory medication, and Vicodin. (Tr. 297.) Dr. Hedayatnia diagnosed plaintiff with degenerative disc disease, lumbar radiculopathy, and paraspinal muscle spasm, and administered an epidural steroid injection and a paraspinal muscle injection. (Tr. 297-98.)

## IV. Medical History During the Relevant Period

### A. 2013

On February 1, 2013, Dr. Parnes performed an MRI of plaintiff's thoracic spine. (Tr. 247-49.) The MRI revealed: mild scoliosis; straightening of the normal curvature of the thoracic spine; "[v]ery mild desiccation of" and posterocentral disc herniation at the T6-T7 and T7-T8 levels; "[v]ery mild hypertrophic changes involving the facet joints in the mid and lower thoracic spine region"; and posterior bulging discs at T9-T10 and T10-T11 levels. (*Id.*) Otherwise, the MRI revealed that plaintiff's thoracic spine was "intact." (*Id.*) On May 1, 2013, Dr. Parnes performed an MRI of plaintiff's cervical spine. (Tr. 250-51.) It revealed largely the same findings at the cervical spine MRI from October 2012, namely: straightening and reversal of the normal curvature of the spine; "very mild disc space

narrowing" and posterior disc herniation with impingement of the anterior thecal sac at C6-C7; slightly enlarged thyroid gland; and "mild scoliosis." (Tr. 251.) The following day, Dr. Parnes performed an MRI of plaintiff's right shoulder. (Tr. 252-53.) The MRI revealed: a small partial tear of the distal supraspinatus tendon; fluid surrounding the bicipital tendon within the bicipital groove; "very mild impingement"; and "sprain or strain subscapularis tendon." (Tr. 253.)

Plaintiff's blood tested positive for benzodiazepine, opiate, and cocaine on February 28, 2013. (Tr. 295.)

An MRI of plaintiff's brain performed by Dr. Parnes on April 15, 2013, was normal and revealed no changes since the brain MRI performed on May 24, 2011. (Tr. 279-80.) On April 23, 2013, Dr. Parnes performed an MRI of plaintiff's orbits in response to plaintiff's reported history of left eye vision problems and numbness and tingling in plaintiff's hands. (Tr. 281-83.) The MRI was normal. (*Id.*) On April 30, 2013, plaintiff was reported as five feet and five inches tall and weighed 190 pounds. (Tr. 266.)

Dr. Parnes conducted an MRI of plaintiff's right shoulder on May 2, 2013 and identified joint fluid, a sprain or strain of the subscapularis tendon, "[v]ery mild degenerative changes" to the anterior right humeral head, "[v]ery mild

impingement," and a "small partial tear of the distal supraspinatus tendon." (Tr. 350.)

On June 18, 2013, plaintiff visited Dr. Enrico Ascher and complained of leg pain and swelling. (Tr. 167.) Among other things, plaintiff denied hearing loss and difficulty breathing. (*Id.*) Dr. Ascher noted that plaintiff had a normal gait. (*Id.*) He assessed plaintiff as having inferior vena cava obstruction in both legs. (Tr. 168.)

Plaintiff visited Dr. Y. Vaynshelbaum on June 20, 2013. (Tr. 261-65.) An examination of plaintiff's kidneys was normal with no evidence of abdominal aortal aneurysm or stenosis. (Tr. 261-62.) Dr. Vaynshelbaum also found that plaintiff's blood flow to her legs was normal, but she had an "increased transverse diameter of the left greater saphenous vein." (Tr. 263.)

Dr. Krishna referred plaintiff to Dr. Sebastian Lattuga, a board-certified orthopaedic spine surgeon. (Tr. 256.) Plaintiff saw Dr. Lattuga on June 27, 2013 for lower back and neck pain. (*Id.*) Dr. Lattuga described the history of plaintiff's back and neck pain as follows, plaintiff: experienced pain in elementary school; fell down stairs while in high school; and sustained an injury from an assault on November 11, 2010. (*Id.*) Plaintiff rated her neck and back pain both as 10 out of 10 and described the pain as "constant and sharp

shooting," which worsened with lifting, carrying, bending, moving around, standing up, lying on side, walking, and sleeping. (*Id.*) Nonetheless, Dr. Lattuga noted that "[t]he problem does not interfere with patient's daily normal function." (*Id.*) Dr. Lattuga noted plaintiff's previous treatments included: physical therapy, TENS unit, epidurals, chiropractics, back brace, warm pack, ice pack, and massage. (*Id.*) Dr. Lattuga performed a musculoskeletal physical examination, motor exam, and diagnostic imaging. (Tr. 257-58.) He found, *inter alia*, tenderness, spasms, and restricted ranges of motion in plaintiff's cervical and lumbar spine; altered sensation in plaintiff's cervical and lumbar spine; and abnormal coordination and antalgic gait in plaintiff's lumbar spine. (Tr. 257.) Dr. Lattuga diagnosed plaintiff with a herniated cervical intervertebral disc, thoracic radiculopathy, and lumbar disc herniation with radiculopathy. (*Id.*) Dr. Lattuga's report indicates that he discussed various treatment options with plaintiff, and that he advised "surgery is not a guarantee that there would be a return of normal neurological function or of a pre-injury state." (*Id.*) Dr. Lattuga also noted that plaintiff was "on high doses of narcotic medication and is a poor surgical candidate." (Tr. 258.) He advised that plaintiff "wean off medications." (*Id.*)

On July 3, 2013, plaintiff saw Dr. Saleh. Dr. Saleh noted that he had seen plaintiff in April 2012 and that plaintiff had been admitted to the hospital two weeks prior for asthma and pneumonia. During the July visit, plaintiff described her pulmonary status as worsening. (Tr. 254, 259-60.) Dr. Saleh noted that plaintiff's "pulmonary state [was] clearly deteriorated." (Tr. 260.) Dr. Saleh prescribed plaintiff Prednisone and Lasix, and he noted that if plaintiff's condition did not improve he would consider "re-admission at the hospital." (Tr. 254, 260.) The medications did not improve plaintiff's condition, and plaintiff was admitted to New York Methodist Hospital from July 9 through July 12, 2013. (Tr. 254.) While there, plaintiff received intravenous steroids. (*Id.*) On July 15, 2013, Dr. Saleh reported plaintiff had "definite improvement in her symptoms" and had been "relatively stable" since her discharge, including decreased dyspenea, wheeze, and cough. (*Id.*) Dr. Saleh lowered plaintiff's Prednisone to 10 mg per day and noted that she "appear[ed] well and in no acute respiratory distress." (*Id.*)

On August 12, 2013, plaintiff went to the Coney Island Hospital walk-in/urgent clinic. (Tr. 363-65.) Plaintiff weighed 227 pounds. (Tr. 363.) She complained of "multiple back disc herniations" and requested Percocet, Xanax, Lyrica, and MS Contin (morphine). (*Id.*) Plaintiff reported that she

had a cane, but the medical record notes that she was walking without a cane. (*Id.*) Dr. Shamin Salman described plaintiff as having "minor depression" and noted that plaintiff was "sad about her condition." (Tr. 364.) Plaintiff was advised to return to the clinic in three months. (Tr. 363.)

Plaintiff returned to the clinic on August 18, 2013, complaining of daily migraine headaches and pain in her lower back, neck, right arm, and left leg. (Tr. 366.) Dr. Richard Conway observed swelling. (*Id.*) Plaintiff reported a history of gastritis, acid reflux, vertigo, and asthma. (*Id.*) At the time, she was taking numerous medications, including two pain medications (oxycodone and morphine), migraine medication (butalbital), and anti-anxiety medication (alprazolam). (Tr. 368.) After a physical exam, the doctor diagnosed plaintiff as obese and found edema bilateral calf ankle nonpitting. (Tr. 367.) He noted that plaintiff was able to stand normally and had a normal gait. (*Id.*) Plaintiff requested a refill for her Xanax prescription, and when the doctor refused to do so, plaintiff left. (Tr. 367-68.)

On August 26, 2013, plaintiff returned to the Coney Island Hospital clinic. (Tr. 369-70.) She reported "severe" pain in her neck and back with mild relief when sitting and on and off numbness with prolonged walking. (Tr. 369-71.) Plaintiff was using a cane to walk and reported using a back

brace for two years. (Tr. 369.) Dr. Narayan Sundaresan described plaintiff as obese and noted that plaintiff had difficulty walking but had a normal gait with her cane. (Tr. 369, 372.) A radiograph performed the same day found "[n]o deep venous thrombosis in either leg." (Tr. 475.) On August 27, 2018, plaintiff visited the pain clinic on a referral from Dr. Conway. (Tr. 376.) Dr. Isaiah Florence discussed various treatments with plaintiff, including a follow up at Kings County pain management center, rehab, physical therapy, and a psychiatric evaluation. (*Id.*) Podiatry notes from the same day indicate plaintiff had "chronic venous insufficiency" and edema in her right leg as well as very dry skin. (Tr. 378.) Plaintiff was instructed to utilize compression stockings and to follow up with the vascular clinic for further evaluation. (*Id.*)

Plaintiff also went to Coney Island Hospital on September 9, 2013. (Tr. 374.) She presented with swelling in both feet and described difficulty putting on shoes; she described her pain as "burning." (*Id.*) The doctor described plaintiff as having "chronic venous insufficiency" and edema in her right leg as well as dry skin. (*Id.*) The doctor also noted that plaintiff would "have to rely on [the] vein clinic for answers to her varicose vein situation." (Tr. 375.)

Plaintiff was admitted at Methodist Hospital from September 13 through September 23, 2013. (Tr. 229.) Plaintiff presented with epigastric pain, which was resolved with medication. (*Id.*) A physical examination revealed tenderness upon palpation of plaintiff's upper abdomen and lower thoracic and lumbar spines. (*Id.*) MRIs of plaintiff's cervical and lumbar spine revealed minimal degenerative changes in each. (Tr. 231.) Plaintiff was instructed to follow up with her primary care doctor, neurologist, and pain specialist. (*Id.*) Her "discharge disposition" was described as "[h]ome: [w]ith the ability to self care." (Tr. 232.) At the time, plaintiff was living alone. (Tr. 233.)

Plaintiff was admitted to Coney Island Hospital on October 18, 2013, complaining of abdominal pain lasting for two months as well as chest discomfort and leg pain. (Tr. 380, 384.) She reported that she had been recently admitted to Methodist Hospital for the same abdominal complaint, and she had been given morphine for the pain and a "PCA." (*Id.*) Upon discharge from Methodist Hospital, plaintiff received pain medication, but the medication did not provide relief. (Tr. 380, 384.) She continued to experience "persistent epigastric pains, vomiting after meals, and profuse constant . . . watery diarrhea." (Tr. 384.) Upon examination at Coney Island Hospital, plaintiff was in mild acute distress and using a

rolling walker. (Tr. 389, 393.) Her neck, chest, lung, back and neurological examinations were normal. (Tr. 382, 385.) The doctor reported "minimal edema" in plaintiff's extremities, calf tenderness (more in the right calf than the left calf), and no tenderness in plaintiff's back. (Tr. 382.) A doctor at the hospital noted "[m]ultiple MRI's apparently showed multiple discs with nerve compression." (Tr. 385; see also Tr. 392 (noting scoliosis and herniated disc).) A Doppler test performed on October 18, 2013 found that there was no evidence of "acute deep venous thrombosis" in plaintiff's lower extremities. (Tr. 473.)

By October 21, 2013, plaintiff was reporting that the pain in her neck, upper back, and lower back was worse than her abdominal pain. (Tr. 389.) She experienced pain with touching on her neck and low back region, which the doctor noted was "exaggerated in context of disease." (Tr. 390.) Her ranges of motion in the upper and lower extremities were within functional limits. (Id.) Dr. Ashok Poluri recommended that plaintiff commence physical and occupational therapy to improve, among other things, her range of motion and mobility. (Tr. 390-91.) As of October 21, 2013, plaintiff's muscle strength was described as "good" and her treatment plan consisted of neuromuscular re-education, facilitate normal movement patterns, therapeutic exercise, and gait training with a two-wheeled

rolling walker. (Tr. 393.) The following day, physical
therapist James Nettleton described plaintiff as "[e]xhibit[ing]
functional improvement" and "ambulating with rolling walker."
(Tr. 395.) On October 24, plaintiff's "goals" included
increasing her abilities to require only minimal assistance with
bathing, using the toilet, and dressing, and also to increase
transfers to and from the bed. (Tr. 404.)

While at Coney Island Hospital, doctors performed an
abdominal CT scan, an endoscopy, and a colonoscopy. The
endoscopy revealed chronic gastritis and hiatus hernia. (Tr.
407.) The colonoscopy revealed "[c]ongested mucosa" throughout
plaintiff's colon, but was otherwise normal, and she was
diagnosed with "[o]ther and unspecified noninfectious
gastroenteritis and colitis." (Tr. 410-18; *see also* Tr. 445,
456.) Similarly, an abdominal CT scan identified abnormalities
that suggested "colitis including infectious and inflammatory
processes." (Tr. 471-72.) Dr. Francis Steinheber recommended
that plaintiff return to the hospital for ongoing care. (Tr.
412.)

Plaintiff was discharged from Coney Island Hospital on
October 24, 2013. At that time, she weighed 197 pounds and was
instructed to follow up with hospital clinics, including the
gastrointestinal clinic (the "GI clinic"), in one week. (Tr.
419-22.)

15

On October 31, 2013, plaintiff visited the Coney
Island Hospital Neurology Clinic.  (Tr. 423-24.)  Dr. Hillary
Clarke diagnosed plaintiff with migraine and morbid obesity.
(Tr. 424.)  Plaintiff exhibited normal strength in her upper
extremities, "3/5" strength in her lower extremities, and normal
sensation.  (*Id.*)  She visited the clinic again on January 31,
2014.  (Tr. 431-32.)  Plaintiff's physical exam was normal, her
primary diagnosis was "[m]igraine without aura," and her
secondary diagnosis was morbid obesity.  (Tr. 431.)  Dr. Clarke
instructed plaintiff to continue her medications and return to
the clinic in four months.  (*Id.*)

On November 1, 2013, plaintiff visited the GI clinic.
(Tr. 427-48.)  Her primary diagnosis was "[o]ther and
unspecified noninfectious gastroenteritis and colitis."  (Tr.
427.)  A physical exam revealed "normal bowel sounds, soft, non-
tender, no masses no heptosplenomegaly."  (*Id.*)  Dr. Steinheber
noted that all testing had been negative and "no underlying
cause [was] found."  (*Id.*)  Dr. Steinheber recommended plaintiff
avoid certain foods, increase her dosage of Lomotil, and return
to the clinic in four months.  (Tr. 427-28.)

On November 15, 2013, Dr. Cohen performed an MRI of
plaintiff's brain because plaintiff was complaining of daily
headaches.  (Tr. 360-61.)  Dr. Cohen concluded that the MRI was
"unremarkable."  (*Id.*)

16

On December 23, 2013, Dr. Krishna conducted a duplex ultrasonographic examination of plaintiff's carotid arteries, and he found "minimal spectral broadening" of plaintiff's left internal carotid artery. (Tr. 291-92.) Plaintiff's blood flow was otherwise normal. (*Id.*) One week later, on December 30, 2013, plaintiff saw Dr. Vadim Kolesnikov, a board-certified radiologist, who performed an MRI of plaintiff's cervical spine. (Tr. 290.) The only abnormality the MRI revealed was "mild midline disc herniations at C5-C6 and C6-C7 disc levels." (*Id.*) The next day, Dr. Kolesnikov conducted an MRI of plaintiff's lumbar spine and identified "[c]ircumferential disc bulge with mild bilateral neural forminal disc herniations at L4-L5 disc level" and "[m]inimal midline disc herniation at L5-S1 disc level." (Tr. 352.)

B. 2014

On January 7, 2014, Dr. Kolesnikov performed an MRI of plaintiff's thoracic spine, which revealed "[m]ild broad-based midline disc herniations . . . at T6-T7 and T7-T8 disc levels contacting the ventral aspect of the thoracic spinal cord." (Tr. 289.)

On January 31, 2014, plaintiff visited the GI clinic for a follow up. (Tr. 425-26, repeated Tr. 429-30.) She was diagnosed with "[a]bdominal pain, generalized." (Tr. 425.) Plaintiff complained of, *inter alia*, loose incontinence,

abdominal swelling, and "upper abdominal pain constant increased with pressure." (*Id.*)  Her abdomen was tender upon palpation and her legs were swollen but there was no edema.  (*Id.*)  Dr. Steinheber noted that plaintiff's colonoscopy, ileal biopsy, and Doppler were all normal.  (*Id.*)  Plaintiff was instructed to return to the clinic in three months.  (Tr. 425.)

On February 11, 2014, plaintiff went to the emergency department at Methodist Hospital.  (*See* Tr. 197-215.)  She complained of wheezing and shortness of breath as well as abdominal pain and cervical prolapse.  (Tr. 197, 201.)  The examiner noted that on examination, plaintiff complained of pain upon a "slight touch" and "scream[ed] in pain" when palpated, but when distracted "there [was] no noticeable complaint of pain." (Tr. 197.)  Similarly, plaintiff was observed walking and moaning but with "no apparent distress seen or grimacing noticed." (*Id.*)  Plaintiff underwent diagnostic imaging:  a chest x-ray revealed no signs of acute cardiopulmonary disease; an abdominal and pelvic CT scan showed no evidence of acute disease, despite a small cyst-like lesion that was unchanged from a prior study; an ultrasound revealed normal kidneys; and cervical and lumbar MRIs showed "mild bulging discs at C6-C7, L4-L5, and L5-S1.  (Tr. 198-200. 204.)  Upon discharge, a home health aide was reinstated and plaintiff was instructed to, among other things, follow up with doctors regarding cervical

prolapse, elevated white blood count, and to engage in physical activity.  (Tr. 197.)

Plaintiff returned to the GI clinic on March 11, 2014, and her physical exam was normal and radiographs revealed no changes since prior exams.  (Tr. 433-34, 467-68.)  Dr. Steinheber noted that plaintiff possibly had irritable bowel syndrome with bladder prolapse and that the "non specific findings on CT do not appear to be significant;" again he diagnosed plaintiff with "[o]ther and unspecified noninfectious gastroenteritis and colitis."  (Tr. 433, 454.)  He recommended that plaintiff return to the clinic in six months.  (Tr. 433.)

On April 24, 2014, plaintiff visited the emergency department at Coney Island Hospital complaining of, among other things, back pain, neck pain, and migraines.  (Tr. 435-37.)  Dr. Andrey Kucherina, MD, described plaintiff as obese and in "mild discomfort" but otherwise normal.  (Tr. 436-37.)  Plaintiff's primary diagnosis was "[c]ontusion of the back."  (Tr. 437.)  Radiographs of plaintiff's lumbar spine and laterals revealed "no evidence of acute fracture or dislocation," scoliosis, or spondylolisthesis.  (Tr. 464.)  They also "demonstrate[d] a nonspecific bowel gas pattern." (*Id.*)  Radiographs of plaintiff's thoracic spine and cervical spine also did not reveal abnormalities.  (Tr. 465-66.)

Plaintiff returned to Methodist Hospital on April 10, 2014 (*see* Tr. 216-25), complaining of "worsening lower extremity swelling for the past 2-3 weeks." (Tr. 216.) Plaintiff was diagnosed with cellulitis and was started on intravenous medications, after which plaintiff's symptoms improved. (*Id.*) The report from this hospital visit indicates that plaintiff had visited Methodist Hospital two weeks prior with redness and tenderness in her legs, for which she was treated with Macrobid that provided some relief. (*Id.*) During the April 10, 2014 visit, plaintiff also complained of chronic back pain; she reported that she usually received morphine for her pain, and morphine was administered. (Tr. 219.) Plaintiff requested to be seen by pain management. (*Id.*) Plaintiff was discharged on April 14, 2014.

Dr. Louis Tranese performed a consultative examination on plaintiff on May 14, 2014. (Tr. 172-80, repeated in part at Tr. 186-91.) Plaintiff reported neck and back pain lasting for several years, resulting from injuries as a child and an assault, and which was aggravated by lifting, overhead motion, and sleeping. (Tr. 173.) She also complained of pain due to lumbar and thoracic disc herniation, scoliosis, and nerve impingement. (*Id.*) Plaintiff reported receiving the following treatments: steroid injections, physical therapy, and medication. (*Id.*) She noted numbness and tingling in her hands

and feet, difficulty balancing, difficulty walking, elbow pain, hip pain, and hand pain; plaintiff was using a rolling walker at the time. (Tr. 173-74.) Plaintiff reported a history of fibromyalgia, asthma, cervical and bladder prolapse, colitis, cellulitis of the lower extremities, and hearing loss. (Tr. 174-75.) At the time, plaintiff was depending on others for daily activities, such as cooking, cleaning, and showering. (Tr. 175.) Plaintiff was using hearing aids in both ears and a rolling walker, which had been prescribed to her. (Tr. 176.)

On examination, plaintiff weighed 190 pounds, which categorized plaintiff as obese. (Tr. 175, 177.) Plaintiff had difficulty walking, needed assistance getting on and off the examination table, and was able to lift herself from a chair while holding on to her rolling walker. (Tr. 176.) Dr. Tranese found that plaintiff's rolling walker was "medically necessary." (*Id.*) Plaintiff's breathing was clear but with decreased breath sounds and scattered wheezes. (*Id.*) Dr. Tranese noted that plaintiff had full flexion in her cervical spine; no scoliosis; decreased flexion in the lumbar spine; full range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles. (Tr. 177.) However, plaintiff had trigger points in her elbows, hips, and back. (*Id.*) Dr. Tranese noted no sensory deficits and that plaintiff's strength in her upper and lower extremities was generally 4/5. (*Id.*) Plaintiff had intact but

slow hand and finger dexterity, and grip strength of 5-/5
bilaterally with pain. (Tr. 178.) Dr. Tranese diagnosed
plaintiff with: neck and back pain with radicular symptoms;
reported history of thoracic disc derangements; alleged
bilateral carpal tunnel syndrome; reported history of
fibromyalgia; bilateral hip pain; a history of asthma; bilateral
hearing loss; difficulty ambulating; and lower extremity
weakness. (*Id.*)

Dr. Tranese concluded that plaintiff had: "severe
limitations with heavy lifting, squatting, kneeling, and
crouching;" "moderate to marked restriction with excess stair
climbing and walking long distances;" and "moderate restriction
with standing long periods." (*Id.*) He also noted that
plaintiff "may have mild restriction with using her hands" to
perform certain tasks and has no limitations with respect to
sitting. (Tr. 178-79.) He advised that plaintiff should
"limit her exposure to environments with increased dust, dander,
pollen, mold, and toxic fumes/chemical irritants." (Tr. 179.)

In a New York State Office of Temporary and Disability
Assistance form signed May 30, 2014, Dr. Rena Khanukayeva noted
plaintiff was five feet, four inches tall and weighed 196
pounds. (Tr. 137.) Plaintiff had recently been referred to an
urologist, vascular surgeon, psychiatrist, and cardiologist.
(*Id.*) Among other things, plaintiff was being treated for

uterine prolapse, asthma, abdominal pain, back pain, and leg pain and swelling. (*Id.*)

On September 8, 2014, Dr. Krishna saw plaintiff, and he subsequently reported that plaintiff was under his care for "the diagnosis of low back pain and neck pain secondary to lumbosacral disc herniation and cervical radiculopathy." (Tr. 136.) Dr. Krishna also reported that plaintiff "has progressively worsening chronic low back pain radiating to both lower limbs, more on the right side," accompanied by "reduced range of motion at the lumbar spine in all directions" and "reduced ankle jerk on the right foot." (*Id.*) At the time, plaintiff was using a walker, utilized hearing aids in both ears due to hearing loss, and had a home health aide seven days per week, seven hours per day "to help with daily living skills." (*Id.*) Dr. Krishna opined that plaintiff was unable to work and required a home health aide seven days per week for seven hours per day to help with daily living skills. (*Id.*)

C. 2015

On August 6, 2015, plaintiff visited The Vascular Institute of New York. (Tr. 476-79.) Plaintiff presented with swelling, pain, discoloration, and burning in her legs. (Tr. 476.) Dr. Ascher noted that plaintiff's gallbladder had been removed on July 29, 2015. (*Id.*) Dr. Ascher assessed plaintiff as having varicose veins of her lower extremities with

complications, which he described as a chronic condition. (Tr. 477.) Dr. Ascher offered a vein ablation procedure to plaintiff and explained that "it may help her minimally not get worse" and "will not help her with chromic lymphedema condition." (*Id.*) He advised plaintiff to use a lymphedema pump and to elevate her leg. (*Id.*)

On August 11, 2015, Dr. Krishna completed a "Medical Assessment of Ability to do Work-Related Activities" for plaintiff. (Tr. 482-84.) According to the assessment, plaintiff could either occasionally or frequently lift less than 10 pounds due to weakness, pain, and decreased range of motion in her upper and lower extremities resulting from cervical radiculopathy. (Tr. 482-83.) Plaintiff's limitations were also due to a herniated lumbar disc and lumbosacral radiculopathy, plaintiff had lower back pain radiating to her legs, resulting in weakness and decreased range of motion. (*Id.*) Dr. Krishna further opined that plaintiff could stand and/or walk for less than two hours and sit for less than six hours in an eight-hour workday. (Tr. 483.)

## V.   <u>Plaintiff's Application for Social Security Benefits</u>

In a disability report filed with plaintiff's application for SSDI in December 2013, plaintiff stated that she was five feet, four inches tall and weighed 200 pounds. (Tr. 56, 112.) According to the disability determination on June 3,

2014 (*see* Tr. 56-63), which denied plaintiff benefits, plaintiff
reported that as a paralegal she occasionally carried 25-30
pounds and frequently carried 20 pounds or less and she sat for
7 or more hours and stood or walked for approximately one hour.
(Tr. 58.)  As a teacher, plaintiff occasionally carried 50 or
more pounds and frequently carried less than 50 pounds and she
stood or walked for 7 or more hours.  (*Id.*)  The determination
diagnosed plaintiff with the severe impairment of obesity and
the non-severe impairment of asthma and found her not to be
credible with respect to her reported symptoms.  (Tr. 60.)  The
report found that plaintiff could occasionally lift or carry 20
pounds, frequently lift or carry 10 pounds, stand and/or walk
for 6 hours in an 8 hour day, and had postural limitations.
(Tr. 61.)

In a disability report dated September 12, 2014,
plaintiff reported seeing Dr. Hazon, a hematologist and
oncologist at Methodist Hospital, with regularity.  (Tr. 125.)
She also reported visiting the Hospital for Special Surgery for
issues related to her back, neck, arms, and legs.  (Tr. 126.)
In her report, plaintiff noted that she needed a walker, wore a
back brace, used hearing aids in both ears, and needed the
assistance of a home health aid to help lift her legs and with
"daily living skills."  (Tr. 127-28.)  She stated that she had
upcoming appointments at Methodist Hospital, Beth Israel

Hospital, Lutheran Hospital, and Coney Island Hospital.  (Tr. 125, 129.)

In an undated disability form completed at some point after September 14, 2014, plaintiff reported having been hospitalized at NYU Hospital for "Edema/Lymphedema."  (Tr. 132.) She also reporting visiting Rebecca Geltzer, a physical therapist, Dr. Ascher, Dr. Krishna, Dr. Justin Mendoza, and Dr. Nidhiry, who, collectively, informed plaintiff that she had a vein in each leg that "does not close fast enough," bilateral lymphedema, neuropathy, spinal and nerve damage, depression, and anxiety.  (*Id.*)  She reported taking a host of medications, including medications for "bladder problems," asthma, nausea, stomach cramping, migraines, "pain," anxiety, depression, and neuropathy, as well as to help her sleep.  (Tr. 133.)

## VI.  **The ALJ Hearing**

Plaintiff had a hearing before ALJ Friedman on August 10, 2015.  (*See* Tr. 26-54.)  At the time of the hearing, plaintiff was living in an apartment with her three-year old daughter.  (Tr. 29.)  Plaintiff testified that her mom and sister, who lived in the same apartment building, assisted with her daughter, and a home health aide assisted with daily tasks, such as showering, cooking, and brushing her teeth.  (Tr. 29-30, 36-38.)  At the time, the home health aide was with plaintiff four hours per day, seven days a week, though, prior to a change

in plaintiff's insurance, the aide had been with plaintiff eight hours per day seven days per week. (Tr. 35-36.) Plaintiff testified that she could complete certain, limited tasks at home on her own for herself and her daughter, such as heating up food in the microwave and putting dishes in the sink. (Tr. 39-40.)

Plaintiff testified that she stopped working as a teacher on January 23, 2013 due to pain and an inability to satisfy the physical responsibilities of teaching. (Tr. 30.) Plaintiff elaborated that she experienced pain across her entire back and swelling in her legs, and that physical therapy, medication, and hot showers and baths provided some relief. (Tr. 31-33.) At the time of the hearing, plaintiff could stand and sit, but she did not specify for what period of time she could do so comfortably, and she testified that she could not walk at all without her walker. (Tr. 33-34.) Her legs were so swollen that they were "quadruple or more" the size they normally were and she could "barely walk." (Tr. 52.) Plaintiff testified that she could "maybe" lift five pounds. (Tr. 34.)

After questioning plaintiff in the manner described above, the ALJ questioned a vocational expert, Yaakov Taitz (the "Vocational Expert"). (Tr. 42-46, 48-51.) The ALJ asked the Vocational Expert what jobs would be available to a person who was sedentary except for the use of a rolling walker. (Tr. 44.) The Vocational Expert testified that the following jobs would be

available:  an information clerk, a mail-order clerk, and an appointment clerk – all of which are sedentary and semi-skilled. (Tr. 44-46.)  These jobs would likely allow for occasional standing, two sick days per month, and up to ten percent of "off task" time per day.  (Tr. 48.)  The ALJ asked plaintiff whether she thought she could work as an information clerk, and she said she did not think it would be possible because it would be too painful to sit all day and because she had to use the bathroom twice per hour.  (Tr. 47-48.)  The ALJ followed up with the Vocational Expert, who testified based on his personal knowledge that those jobs would allow "occasional standing for five minutes or so."  (Tr. 48.)  However, if plaintiff had to take breaks for standing or otherwise that constituted more than ten percent of the workday, then she would not be able to work. (Tr. 51.)

## STANDARD OF REVIEW

The court assesses whether (1) the proper legal standards for the determination of disability were applied, and (2) whether there was substantial evidence in the record to support the administrative findings of fact.  *See* 42 U.S.C. § 405(g); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).  The court may only set aside the Commissioner's determination if the decision of the ALJ fails to adhere to either of the

aforementioned requirements.  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); 42 U.S.C. § 405(g).

To be eligible for Social Security benefits, an individual's diagnosed impairment must meet basic requirements of duration and severity, demonstrable by medical evidence.  *See* 42 U.S.C. § 423(d).  First, the plaintiff's impairment must be "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  *Id.* § 423(d)(2)(A).  If there are multiple impairments, it is their combined effect that must be considered, not their individual severity.  *Id.* § 423(d)(2)(B).  The impairment must be one "which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  *Id.* § 423(d)(1)(A).  Individual statements regarding disability are insufficient — a claimant must furnish "such medical and other evidence of the existence [of the disability] as the Commissioner of Social Security may require."  *Id.* § 423(d)(5)(A).

The Social Security Regulations (the "Regulations") require that an ALJ employ a five-step analysis to evaluate whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520.  "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that [she] has a 'severe impairment,' (3) that

the impairment is not one that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in [her] prior type of work, the Commissioner must find [her] disabled if (5) there is not another type of work the claimant can do." *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002). Step four requires the ALJ to determine the claimant's residual functional capacity ("RFC"), which is the most a claimant can do in a work setting despite his or her limitations. 20 C.F.R. § 404.1520(e). The burden of proof rests on the plaintiff at steps one through four, but it shifts to the ALJ at step five to show that work exists in the national economy that the claimant can perform. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

In order to properly assess the accuracy of the ALJ's application of the legal standards and the evidentiary support for the ALJ's disability decision, the court must be sure that the ALJ considered all of the evidence available. *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("Factual determinations, based on the weighing of evidence, are within the ALJ's competence; however, in making these determinations, the ALJ must address the evidence on the record. . . . [T]he ALJ's failure to mention several parts of the record which contradict his conclusion constitutes error."). "[A] district court must determine whether the correct legal standards were

applied and whether substantial evidence supports the decision."
*Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).
Substantial evidence is "more than a mere scintilla.  It means
such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." *Richardson v. Perales*, 402
U.S. 389, 402 (1971) (internal quotation marks omitted).
Evidence must be substantial not on its own, but in the context
of the full, complete record. *McIntyre v. Colvin*, 758 F.3d 146,
149 (2d Cir. 2014).

The court may remand a disability decision for further
proceedings at the administrative level.  42 U.S.C. § 405(g).
Remand for development of evidence or more specific findings is
particularly appropriate where there are gaps in the
administrative record or where further findings or explanation
may clarify the ALJ's rationale. *See Grace v. Astrue*, No. 11-
cv-9162, 2013 WL 4010271, at *14 (S.D.N.Y. July 31, 2013).

## DISCUSSION

Plaintiff raises two issues.  First, she argues that
the ALJ improperly weighed the medical evidence, specifically by
assigning significant weight to Dr. Tranese's opinion and not
assigning controlling weight to the opinion of Dr. Krishna,
plaintiff's treating physician.  Next, plaintiff argues that the
ALJ impermissibly disregarded her testimony regarding her need
for assistance from a home aide and family members.  Plaintiff

requests that the court vacate and remand for purposes of awarding and calculating benefits, or, in the alternative, for further administrative proceedings, including a new hearing.  In contrast, defendant argues that there was substantial evidence in the record to support the ALJ's decision.  For the reasons stated below, the motions for judgment on the pleadings are denied and this case is remanded for further administrative proceedings consistent with this Memorandum and Order.

I.   **The ALJ Decision**

On September 22, 2015, the ALJ issued a decision denying plaintiff SSDI benefits.  (*See* Tr. 13-21.)  At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (Tr. 15.)  At step two, the ALJ found that plaintiff had severe and non-severe impairments.  Specifically, plaintiff had the following severe impairments:  lumbar, thoracic, and cervical spine derangement; bilateral leg edema; and obesity.  (*Id.*)  She also had the following non-severe impairments: asthma; cervical impairments; carpal tunnel syndrome; fibromyalgia; diabetes; and bilateral hearing loss.  (Tr. 15-16.)  The ALJ specifically considered Disorders of the Spine, under Listing 1.04, and found that the record did not establish the existence of an impairment or combination of impairments that meet or medically equal the criteria of a listed impairment.  (Tr. 16.)  The ALJ found that

plaintiff's depression and anxiety were not medically determinable impairments.  (*Id.*)

The ALJ determined that plaintiff has a RFC to perform sedentary work, except that plaintiff requires the use of a rolling walker.  (Tr. 17.)  In coming to that determination, the ALJ considered plaintiff's symptoms, objective medical evidence, and other evidence.  (*Id.*)  The ALJ relied on a two-step process in assessing plaintiff's claimed symptoms.  (*Id.*)  First, the ALJ assessed whether plaintiff suffered from "an underlying medically determinable physical . . . impairment(s) . . . that could reasonably be expected to produce [plaintiff's] pain or other symptoms."  (*Id.*)  The ALJ found they could.  (*Id.*)  Second, the ALJ considered plaintiff's statements regarding the intensity, persistence, and limiting effects of plaintiff's symptoms.  (*Id.*)  The ALJ concluded that plaintiff's allegations to that effect "were not entirely credible for the reasons explained in [the ALJ's] decision." (*Id.*)  He specifically noted that plaintiff's testimony that she needed assistance from family members and a home health aide for activities of daily living was unsupported because:  at the consultative exam with Dr. Tranese, plaintiff "was capable of maneuvering the examination with the assistance of a walker and was not incapable of rising from a chair;" and during an emergency department visit in August 2015, plaintiff "was not

observed in any distress and maintained appropriate hygiene," and her pain at that time was related to edema and not back pain. (Tr. 19.)

In conjunction with his assessment of plaintiff's RFC, the ALJ considered plaintiff's statements regarding her abilities and needs, medical records pre-dating plaintiff's alleged onset date, and medical records from the relevant period. (Tr. 17-19.) He specifically considered medical evidence pertaining to plaintiff's leg edema and weakness, obesity, and spine and back pain. (*Id.*) He assigned "significant weight" to Dr. Tranese's opinion and "some weight" to Dr. Krishna's opinion. (Tr. 18-19.)

At step four, the ALJ determined that plaintiff was incapable of performing past relevant work as a paralegal or teacher. (Tr. 19-20.) At step five, the ALJ considered plaintiff's age, education, work experience, and RFC, as well as the Vocational Expert's testimony, and found that there were significant jobs – specifically, information clerk, mail order clerk, and account clerk – in the national economy that plaintiff could perform, and, therefore, plaintiff was not disabled. (Tr. 20-21.)

## I. __The Treating Physician Rule and the Duty to Develop the Record__

### A. Legal Standard

An ALJ may consider various types of evidence, including medical opinions. *See* 20 C.F.R. § 404.1527. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairments(s), and [the claimant's] physical or mental restrictions." *Id.* § 404.1527(a)(1). Generally, when weighing medical opinions, the ALJ should consider following factors: examining relationship; treating relationship, its length, nature, and extent; supportability, such as clinical signs and findings; consistency with the record as a whole; and specialization. *Id.* §§ 202.1527(c), 404.1527(c).

A treating physician's opinion is entitled to controlling weight if his or her opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Id.* § 404.1527(c)(2). Under the "treating physician rule," the opinions of a claimant's "treating physician" are entitled to a degree of deference, and the ALJ is "required either to give . . . controlling weight [to

such opinions] or to provide good reasons for discounting them."
*Zabala*, 595 F.3d at 209 (citing 20 C.F.R. § 404.1527(d)(2)); *see also Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)
(explaining ALJ must "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion").

An "ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion," including: "(i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA]'s attention that tend to support or contradict the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). A treating source's opinion may not be entitled to controlling weight if it contradicts other substantial evidence or if it is internally inconsistent. *Williams v. Comm'r of Soc. Sec.*, 236 F. App'x 641, 643-44 (2d Cir. 2007); *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (summary order).

ALJs may consider evidence other than that from treating physicians. They "will evaluate every medical opinion [they] receive" using the same factors listed above. 20 C.F.R.

§ 404.1527(c).  Generally, more weight will be given to the medical opinion of a source who examined the claimant than one who did not.  *Id.*  "ALJs should not rely heavily on the findings of consultative physicians after a single examination."  *Selian*, 708 F.3d at 419.  Nonetheless, an ALJ may accord a consulting physician's opinion "significant weight" and, in certain circumstances, that opinion can constitute substantial evidence supporting an ALJ's conclusions if it is consistent with objective medical evidence.  *See Torres v. Astrue*, No. 11-cv-5260, 2013 WL 802440, at *12 (E.D.N.Y. Mar. 5, 2013).

Because social security proceedings are "essentially non-adversarial," the ALJ has an affirmative duty to develop the record.  *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (citation omitted).  An ALJ must ensure that "[t]he record as a whole [is] complete and detailed enough to allow the ALJ to determine [the] claimant's [RFC]."  *Casino-Ortiz v. Astrue*, No. 06-cv-155, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing 20 C.F.R. § 404.1513(e)(1)-(3)).  "The duty to develop the record is even more important when the information concerns the claimant's treating source."  *Laureano v. Comm'r of Soc. Sec.*, No. 17-cv-1347, 2018 WL 4629125, at *11 (S.D.N.Y. Sept. 26, 2018).  As part of the ALJ's duty to develop the record, he or she must "make every reasonable effort to obtain a claimant's treating physician's medical records."  *Barrie on*

*behalf of F.T. v. Berryhill*, No. 16-cv-5150, 2017 WL 2560013, at *10 (S.D.N.Y. June 12, 2017) (citation and internal quotation marks omitted).

B. Application

Plaintiff argues that the ALJ erred in denying Dr. Krishna's opinion controlling weight. (ECF No. 13, Pl. Mem. at 15-17.) The court agrees insofar as it finds that the ALJ did not comply with the proper legal standards when parting from the treating physician rule.

ALJ Friedman only accorded "some weight," rather than "controlling weight," to plaintiff's treating physician, Dr. Krishna, who opined, among other things, that plaintiff "would be incapable of standing or walking even two hours in an eight-hour workday or sitting even six hours" due to progressive lumbosacral herniation and cervical radiculopathy. (*Id.; see also* Tr. 482-83.) In support of allocating "some weight" to Dr. Krishna, the ALJ explained that there were no specific records of Dr. Krishna treating plaintiff, the opinion was not well supported by the evidence, and there was no evidence that plaintiff's need for a walker and sedentary job precluded working altogether. (Tr. 482-83.)

Although ALJs are not required to recite every single factor in considering how much weight to accord a treating physician, ALJ Friedman's explanation nonetheless fails to

38

satisfy the Regulations' requirements. The ALJ did not consider
the length of Dr. Krishna's treating relationship with
plaintiff, which appears to have spanned from at least May 2007
until August 2015. (*See* Tr. 284, 482-84.) The ALJ accurately
noted that the record does not include records documenting Dr.
Krishna's examinations of plaintiff. However, it is within the
ALJ's authority and duty to develop the record if he finds it
lacking, and therefore the ALJ should have requested Dr.
Krishna's medical records for plaintiff if he found them to be
necessary. *See Laureano*, 2018 WL 4629125, at *11 (describing
importance of developing the record with respect to treating
physician's medical reports). The record reflects no efforts on
the ALJ's part to obtain any records from Dr. Krishna. Thus,
the ALJ failed to satisfy his duty to develop the record.
Moreover, the ALJ failed to consider Dr. Krishna's specialty as
a neurologist and the relevance of that specialty to his
opinion.

Failure "to provide good reasons for not crediting the
opinion of a claimant's treating physician is ground for
remand." *Sanders v. Comm's of Soc. Sec.*, 506 F. App'x 74, 77
(2d Cir. 2012); *see also Halloran*, 362 F.3d at 32-33 ("We do not
hesitate to remand when the Commissioner has not provided 'good
reasons' for the weight given to a treating physician[']s
opinion."). Here, the ALJ has not provided "good reasons" for

assigning Dr. Krishna's opinion "some weight," and therefore this case must be remanded. Moreover, the ALJ's error in failing to apply the proper legal principles when denying the treating physician's opinion controlling weight cannot be considered harmless because Dr. Krishna's opinion, if credited, "might yield a substantially different result." *Thomas v. Colvin*, 302 F. Supp. 3d 506, 511 (W.D.N.Y. 2018). Specifically, his opinion that plaintiff cannot sit for more than six hours in an eight hour work day would likely render her incapable of performing the jobs identified by the Vocational Expert.

The Commissioner argues that, regardless, the ALJ's decision is support by substantial evidence. However, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Meadors v. Astrue*, 370 F. App'x 179, 184 (2d Cir. 2010) (citation and internal quotation marks omitted). Therefore, the above identified deficits in the ALJ's reasoning do not require that the court address defendant's argument that the ALJ's decision is supported by substantial evidence.

## II. **Credibility Determination**

### A. Legal Standard

An ALJ may consider subjective symptoms when determining a claimant's RFC. *Chickocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013). However, there must be some objective medical findings to support the allegations. 20 C.F.R. § 404.1529(c)(3); Social Security Regulation ("SSR") 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010); *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999). When a claimant's testimony and the medical evidence are conflicting, the ALJ must employ a two-step evaluation to assess the reliability of the claimant's testimony. *See* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p; *Meadors*, 370 F. App'x. at 183. First, the ALJ must determine if the claimant has an underlying impairment that could cause the alleged symptoms. 20 C.F.R. § 404.1529(c)(3). If so, then "the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective symptom] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors*, 370 F. App'x at 183; *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

When evaluating an individual's symptoms, the ALJ must consider the following seven factors:

> (i) [The claimant's] daily activities; (ii) The
> location, duration, frequency, and intensity of [the
> claimant's] pain or other symptoms; (iii)
> Precipitating and aggravating factors; (iv) The type,
> dosage, effectiveness, and side effects of any
> medication [the claimant] take[s] or ha[s] taken to
> alleviate [the claimant's] pain or other symptoms; (v)
> Treatment, other than medication, [the claimant]
> receive[s] or ha[s] received for relief of [the
> claimant's] pain or other symptoms; (vi) Any measures
> [the claimant] use[s] or ha[s] used to relieve [the
> claimant's] pain or other symptoms . . . ; and (vii)
> Other factors concerning [the claimant's] functional
> limitations and restrictions due to pain or other
> symptoms.

20 C.F.R. § 404.1529(c)(3)(i-vii); *see also Owens v. Berryhill*,

No. 17-cv-2632, 2018 WL 1865917, at *8 (E.D.N.Y. Apr. 18, 2018).

The ALJ will address evidence of those factors to the extent

such evidence is available.  20 C.F.R. § 404.1529 (c)(4);

*Meadors*, 370 F. App'x at 183.  The ALJ's decision "must contain

specific reasons for the finding on credibility, supported by

the evidence in the case record, and must be sufficiently

specific to make clear to the individual and to any subsequent

reviewers the weight the adjudicator gave to the individual's

statements and the reasons for that weight."  SSR 96-7p; *see*

*also Chickori v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013).

The lack of substantial detail in the ALJ's assessment

will not require remand as long as "the evidence of record

permits [the court] to glean the rationale of an ALJ's

decision."  *Chickori*, 534 Fed App'x at 76 (internal quotation

marks omitted) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040

(2d Cir. 1983)).  Where, as here, an ALJ fails to sufficiently explain a finding that a claimant's testimony was not entirely credible, remand is appropriate.  *Tornatore v. Barnhart*, No. 05-cv-6858, 2006 WL 3714649, at *6 (S.D.N.Y. Dec. 12, 2006). Credibility determinations by the ALJ are, like the overall decision on disability, given deference, provided that they are based on substantial evidence.  *Vargas v. Astrue*, No. 10-cv-6306, 2011 WL 2946371, at *15 (S.D.N.Y. July 20, 2011) (citing *Aponte v. Sec'y, Dep't of Health and Human Serv. of U.S.*, 728 F.2d 588, 592 (2d Cir. 1984)).

B.  Application

Plaintiff argues that the ALJ improperly "dismissed plaintiff's testimony that she needs the assistance of a home aide and of family members."  (ECF No. 13, Pl. Mem. at 17.)  The court agrees.

The ALJ's analysis fails to consider all of the mandatory factors for which there was available evidence.  As discussed above, ALJ Friedman employed the two-step test when assessing plaintiff's symptoms.  First, he found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (Tr. 17.)  Next, the ALJ concluded that plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely credible for the reasons explained in [the

ALJ's] decision." (*Id.*) Apart from that general statement, the ALJ relied on observations from two medical reports in support of his determination. First, he noted that at plaintiff's consultative examination on May 14, 2014, Dr. Tranese reported that plaintiff "was capable of maneuvering the examination with the assistance of a walker and was not incapable of rising from a chair." (Tr. 19.) Next, the ALJ noted that during an emergency room visit in August 2015 plaintiff "was not observed in any distress and maintained appropriate hygiene." (*Id.*) Elsewhere in his decision, the ALJ noted that plaintiff "reported improvements in pain with medication," lived at home with her three-year old daughter, denied completing daily activities (e.g., shopping, cooking, cleaning, and washing herself) independently, could only lift five pounds, and had limitations with sitting and walking for prolonged periods of time. (Tr. 17.) The court finds the ALJ's stated reasons insufficient to support his credibility findings.

Despite considering the above, in his analysis, the ALJ neglected the following mandatory factors for which there was evidence in the record: the location, duration, frequency, and intensity of plaintiff's symptoms; precipitating and aggravating factors; the type and dosage of plaintiff's medications; and treatment other than medications. *See* 20 C.F.R. § 404.1529(c)(3).

The record includes evidence that plaintiff had been prescribed and was taking various medications to alleviate her pain systems during the relevant period, including, but not limited to, anti-inflammatory medications and the following pain medications: Vicodin, morphine, Percocet, and oxycodone. (Tr. 219, 297, 368, 380, 384.) Plaintiff also reported using a back brace and participating in physical therapy. (Tr. 127, 173, 256, 297, 369, 376.) The ALJ did not mention these medications and other forms of relief in his decision nor did he ask plaintiff about her medications during the hearing. Although he noted that plaintiff "reported improvements in pain with medication," he did not specify to which medications or improvements he was referring. (Tr. 17.)

With respect to plaintiff's reliance on a home health aide and family members for assistance, the ALJ failed to consider that a home health aide was reinstated upon plaintiff's discharge from Methodist Hospital and plaintiff's "goals" prescribed by doctors at Coney Island Hospital included increasing her abilities such that she needed only minimal assistance with daily activities. (Tr. 19, 404.) The ALJ did not adequately explain why he discredited plaintiff's testimony that she was incapable of completing daily tasks of living on her own. Moreover, the ALJ appears to have ignored relevant comments from the same opinion on which he relies in finding

plaintiff capable of independent functioning.  Specifically, Dr. Tranese noted that plaintiff needed assistance getting on and off the examination table and, although she could rise from a chair on her own, she needed the assistance of her rolling walker to do so.  (Tr. 176.)

Throughout plaintiff's medical records, there are notations of plaintiff reporting back, neck, leg, hip, elbow, and abdominal pain.  (*See, e.g.*, Tr. 167, 173, 231, 256, 366-67, 476, 482.)  During the hearing, plaintiff testified that she did not think that she could sit all day, a requirement for all of the jobs proposed by the vocational expert, because it would be too painful and because she had to use the bathroom twice per hour.  (Tr. 47-48.)  The ALJ explained that if plaintiff took breaks to accommodate these needs, she would be incapable of working.  (Tr. 51.)  The ALJ did not provide additional hypotheticals nor did he explain why he apparently discredited plaintiff's testimony.  Relatedly, the record includes recommendations and referrals for plaintiff to see pain management doctors, which the ALJ ignored.  (*See* Tr. 297, 376.) Plaintiff also reported aggravating and precipitating factors, i.e., that her pain worsened with lifting, carrying, bending, moving around, standing up, lying on her side, walking, and sleeping.  (Tr. 173, 256.)

Despite evidence of these relevant and potentially significant factors, the ALJ did not discuss them in his decision or, in some cases, inquire about them during the hearing.  If the ALJ detected inconsistencies in plaintiff's testimony, it was his duty to ask about those inconsistencies during the hearing.  *Arias v. Astrue*, No. 11-cv-1614, 2012 WL 6705873, at *2 (S.D.N.Y. Dec. 21, 2012.)  Because ALJ Friedman failed to address mandatory factors for which there was relevant evidence in the record, and provided no explanation for these omissions, remand is appropriate.  *See Wright v. Astrue*, No. 06-cv-6014, 2008 WL 620733, at *3 (E.D.N.Y. Mar. 5, 2008) (remanding because ALJ considered some, but not all, of the seven factors set forth in the Regulations); *Tornatore*, 2006 WL 3714649, at *6 (same); *Owens v. Berryhill*, No. 17-cv-2632, 2018 WL 1865917, at *9-10  (E.D.N.Y. Apr. 18, 2018) (same).

Defendant argues that plaintiff's history of hospital visits are "indicative of drug-seeking behavior," especially given lab evidence that plaintiff had used marijuana and cocaine, and therefore supports discrediting her testimony. (ECF No. 15, Def. Mem. at 31.)  Although it is within the ALJ's discretion to consider such evidence, *see, e.g.*, *Elliot v. Comm'r of Social Sec.*, No. 16-cv-672, 2018 WL 4539579, at *7 (W.D.N.Y. Sept. 21, 2018), it does not appear that the ALJ did consider this evidence in making his credibility determination.

It is not this court's place to independently assess the
plaintiff's credibility, and therefore the court does not
consider what defendant describes as "drug-seeking behavior."

For the above-stated reasons, the court finds that the
ALJ did not apply the proper legal standard when assessing
plaintiff's credibility.

**CONCLUSION**

For the reasons set forth above, the court denies the Commissioner's motion for judgment on the pleadings, and grants plaintiff's cross-motion to the extent she seeks remand of her action for further proceedings consistent with this Memorandum and Order. Specifically, upon remand, the ALJ should:

(1) Reevaluate plaintiff's symptoms in light of all relevant evidence in the record and, where necessary, develop the record further by asking plaintiff questions about, for example, her symptoms and medications;

(2) Develop the record to include all treating records from plaintiff's treating physicians, including but not limited to, Dr. Krishna;

(3) Apply the proper legal principles when evaluating and determining what weight to assign the opinions of physicians like Dr. Krishna; and

(4) Conduct a new hearing.

The Clerk of Court is respectfully directed to close the case.

**SO ORDERED.**

Dated:      March 5, 2018
            Brooklyn, New York

                                        /s/
                              _____
                              **KIYO A. MATSUMOTO**
                              United States District Judge
                              Eastern District of New York